# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| NAYLOR MEDICAL SALES & RENTALS, INC. and JERRY ALLEN UNDERWOOD, | ) ) ) | |
| Plaintiffs/Counter-Defendants, | ) ) | |
| v. | ) ) | No. 09-2344-STA-cgc |
| INVACARE CONTINUING CARE, INC., f/k/a HEALTHTECH PRODUCTS, INC., and INVACARE CORPORATION, | ) ) ) ) | |
| Defendants/Counter-Plaintiffs | ) | |

_____

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
_____

On September 14, 2010, Defendants, Invacare Continuing Care, Inc., f/k/a HealthTech Products, Inc., and Invacare Corporation (collectively "Defendants"), filed a Motion for Summary Judgment (D.E. # 60) as to all of Plaintiffs', Naylor Medical Sales & Rentals, Inc. and Jerry A. Underwood (collectively "Plaintiffs"), claims.  For the reasons set for below, the Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

## BACKGROUND

On April 22, 2009, Plaintiffs filed a Complaint in Shelby County Chancery Court asserting claims of breach of contract, conversion, defamation, and violations of the Tennessee Consumer Protection Act.  Defendants filed a Notice of Removal (D.E. # 1) with this Court on June 2, 2009.  Defendants then filed an Answer to Plaintiff's Complaint (D.E. # 3) on June 5, 2009.  After receiving leave of this Court, Plaintiffs filed a Second Amended Complaint on May

25, 2010, asserting the additional claims of intentional misrepresentation and fraud. (D.E. # 54.) The following facts are undisputed for purposes of this Motion unless otherwise noted.

Defendants are in the business of manufacturing and distributing medical equipment. Defs.' Statement of Facts ¶ 1. Before 2007, Defendants had a small but growing health care equipment rental division.[1] (*Id.* ¶ 3.) Naylor Medical Sales & Rentals, Inc. ("Naylor") is a health care equipment rentals company (*Id.* ¶ 2), and Jerry Underwood ("Underwood") is the President of Naylor. Pls.' Resp. to Defs.' Statement of Facts ¶ 2.

In early 2007, Defendants and Underwood began discussing the sale of Naylor's assets. Defs.' Statement of Facts ¶ 5. During this time, Defendants utilized the services of Scott McDaniel ("McDaniel"), an independent contractor hired by Defendants as a consultant. (*Id.* ¶ 6.) McDaniel had experience in medical equipment rentals, and Defendants hired him to help develop their rental division. (*Id.* ¶ 7.) McDaniel was a close friend and former business associate of Underwood, (*Id.* ¶ 10), and McDaniel actually introduced Underwood to the Defendants before he was employed by the Defendants. (*Id.* ¶ 13.)

On October 25, 2007, Plaintiffs and Defendants executed a Letter of Intent, providing that Naylor's purchase price would be between $1.8 million and $2.1 million.[2] (*Id.* ¶ 22.) From early 2007 to the actual time of acquisition, Defendants performed their due diligence and

---

[1] Plaintiffs dispute this fact and state that "[b]efore 2007, [Defendants] had a small rental division that was consistently losing money. From the limited discovery provided to the Plaintiffs, it appears that [Defendants] rental division did not actually grow or turn a profit until after [Defendants] acquisition of Naylor." Pls.' Resp. to Defs.' Statement of Facts ¶ 3.

[2] Plaintiffs received one other offer, however, the offer was substantially less than what the Defendants paid. Defs.' Statement of Facts ¶ 24. Plaintiffs state that this offer was immediately rejected by Underwood and was not a reflection of anyone's evaluation of the value of Naylor. Pls.' Resp. to Defs.' Statement of Facts ¶ 24.

attempted to obtain all necessary information from Underwood to ascertain an appropriate purchase price for Naylor's assets. (*Id.* ¶ 20.) Defendants state, however, that during this time period Underwood was not fully forthcoming or cooperative and was resistant to disclosing financial and customer information to Defendants, despite multiple requests. (*Id.* ¶ 21.) Plaintiffs, however, dispute this assertion and state that Defendants' consultants Pease & Associates were given full access to Naylor by Underwood and that Underwood believed that he delivered all of the financials requested by the Defendants. Pls.' Resp. to Defs.' Statement of Facts ¶ 21. Plaintiffs further submit that even Defendants' own witness testified that they were not refused any information during the due diligence period with one exception--that Defendants were not permitted to contact Naylor's customers. (*Id.*)

Regarding these customers, Defendants specifically state that Underwood did not provide them with a customer list until February 2008, a month before the closing of the acquisition, and Defendants were not permitted to contact any of Naylor's customers in connection with the due diligence process. Defs.' Statement of Facts ¶ 25. However, Plaintiffs contend that Defendants elected not to demand full access to or consent from any customers other than Freedom Medical prior to closing, and that Defendants were able to speak to Freedom Medical, Naylor's largest and only material customer, at least one and one half months prior to closing. Pls.' Resp. to Defs.' Statement of Facts ¶ 25.

On March 31, 2008, despite the issues mentioned above, the parties signed the Asset Purchase Agreement with the purchase price of $2.1 million. Defs.' Statement of Facts ¶ 26. Defendants state that this purchase price was based on five times EBITDA, a reasonable estimate of the value of the assets. (*Id.* ¶ 23.) Plaintiffs add, however, that although Defendants may

have performed their internal calculations based upon five times EBITDA, the parties agreed

upon a fixed number for the purchase price.  Pls.' Resp. to Defs.' Statement of Facts ¶ 23.

Plaintiffs further state that Underwood did believe the purchase price to be low, but that he

accepted the lower price based upon representations made by  Defendants and McDaniel "about

the future opportunities, employment, and being able to grow."  (*Id.*)

Section 3.2 of the Asset Purchase Agreement detailed exactly how the purchase price was

to be paid.  According to 3.2, the purchase price of $2.1 million would be paid to Plaintiffs in

two steps:  first, Defendants were to wire $1,720,000 to Plaintiffs; second, Defendants were to

deposit $380,000 into the Escrow Account "pursuant to the terms of the Escrow Agreement."

Defs.' Statement of Facts ¶ 27.

The Escrow Agreement, pursuant to which Defendants deposited $380,000 of the

purchase price ("Escrow Funds"), explained that First Tennessee Bank ("First Tennessee") was

to be the escrow agent (*Id.* ¶ 29) and directed First Tennessee to invest the Escrow Funds in a

money market account.  (*Id.* ¶ 30.)  The parties agreed to the deposit of the Escrow Funds in the

event Defendants had a claim against Plaintiffs under the Asset Purchase Agreement.  (*Id.* ¶ 31.)

Important to this case, Section 3 of the Escrow Agreement specifically states that:

> From time to time on or before March 31, 2009 . . . , Buyer may give notice (a
> "Notice") to Seller and Escrow Agent specifying in reasonable detail the nature and
> dollar amount of any claim (a "Claim") it may have under the Purchase Agreement.
> If a Notice is given with respect to a Claim, Escrow Agent shall make payment with
> respect thereto only in accordance with (i) joint written instructions of Buyer and
> Seller or (ii) a final non-appealable order of a court of competent jurisdiction.

(*Id.* ¶ 31.)  To date, the Escrow Funds remain on deposit with First Tennessee.  (*Id.* ¶ 33.)

Furthermore, the Asset Purchase Agreement contained additional clauses important to

this matter.  First, the Asset Purchase Agreement included the following representations: (1) that

"[n]o broker or finder has acted for Buyer or its Affiliates in connection with this Agreement," and (2) that "no broker or finder retained by Buyer or its Affiliates is entitled to any brokerage or finder's fee." (*Id.* ¶ 34.) Second, the Asset Purchase Agreement included that Underwood agreed to "repurchase from [Defendants]" any unpaid and uncollected accounts receivable at the option of the Defendants. (*Id.* ¶ 28.) And, according to the Plaintiffs, the Agreement further stipulated that "[s]eller shall have the right to verify the existence of the unpaid balance of any accounts receivable." Pls.' Resp. to Defs.' Statement of Facts ¶ 28.

**Finder's Fee Provisions**

With regard to the finder's fee provisions, Plaintiffs assert that McDaniel acted as a finder for the Defendant and that McDaniel was paid a finder's fee of $30,000, contrary to the Asset Purchase Agreement. (*Id.* ¶ 8.) Defendants, however, contend that McDaniel did not act as a finder or broker for Defendants, Defs.' Statement of Facts ¶ 8, and that they did not pay a finder's fee to McDaniel in connection with the acquisition of Naylor's assets. (*Id.* ¶ 9.)

To dispute Defendants' denial that McDaniel acted as a finder and was paid a finder's fee, Plaintiffs state that McDaniel introduced Underwood to the Defendants, he worked to make Underwood interested in selling Naylor to the Defendants, and he convinced Underwood to close at a price favorable to the Defendants. Pls.' Resp. to Defs.' Statement of Facts ¶ 8. Plaintiffs also highlight the testimony of Daryn Kinkoph ("Kinkoph"), the Defendants' controller:

> Q.    How much was Scott McDaniel's finder's fee?
> A.    I think we paid him $30,000, if I recall.

(*Id.*) Furthermore, Plaintiffs assert that prior to the closing date, Mike Will ("Will"), an employee of the Defendants, expressed his opinion and concern to Defendants and their representatives that the Defendants should disclose McDaniel's finder's fee to the Plaintiffs.

(*Id.* ¶ 9.)  In fact, Plaintiffs state that the Defendants' payment of the finder's fee was intentionally hidden from Plaintiffs.  (*Id.*)

To refute these statements, Defendants state that Underwood knew McDaniel was employed by the Defendants before he even began negotiations with the Defendants.  Defs.' Statement of Facts ¶ 11, and that Underwood knew that McDaniel was being compensated for his work with the Defendants.  (*Id.* ¶ 12.)  Plaintiffs state, however, that Underwood was specifically advised that McDaniel would receive the same compensation from the Defendants whether or not the Defendants acquired Naylor.  Pls.' Resp. to Defs.' Statement of Facts ¶ 11.  Moreover, Plaintiffs state that Underwood never knew that McDaniel had a financial incentive to convince Underwood to close on the sale to the Defendants.  (*Id.*)  In fact, Plaintiffs state that Underwood never believed that McDaniel had any incentive to find and close deals for the Defendants.  (*Id.*)

McDaniel's employment with the Defendant is governed by a Consulting Agreement, which provides that he is compensated through a flat monthly fee and a quarterly bonus based on a percentage of the Defendants' rental revenue.  Defs.' Statement of Facts ¶ 14.  Defendants state that McDaniel's Consulting Agreement was not clear that his bonus would not include acquired revenue such that "in the interest of fairness, and to encourage [] McDaniel to work to grow acquired business once that business became part of [the Defendants], [Defendants] unilaterally decided to pay [] McDaniel a flat, one-time bonus of $30,000, while at the same time clarifying that his agreement did not provide for including acquired revenue in his regular bonus calculation."  (*Id.* ¶ 15.)  Plaintiffs dispute this assertion and state that McDaniel's Consulting Agreement, which was not disclosed to Underwood prior to litigation, is absolutely clear in that

the Defendants were contractually obligated to pay McDaniel monthly compensation and, contrary to what was disclosed to Underwood, a bonus on all revenue with no exclusion for acquisitions. Pls.' Resp. to Defs.' Statement of Facts ¶ 15.

Defendants further state that the decision to pay McDaniel the bonus was not made until days before closing the purchase of Naylor, and McDaniel did not know that he would be paid the bonus until after the deal had been completed. Defs.' Statement of Facts ¶ 16. Further, Defendants state that the amount of McDaniel's bonus was not tied to the purchase price, was not negotiated by McDaniel, and was instead set unilaterally by the Defendants. (*Id.* ¶ 17.) Moreover, Defendants state that McDaniel was not even happy with the decision and reluctantly accepted the bonus. (*Id.* ¶ 18.)

Additionally, Defendants state that the bonus paid to McDaniel does not comport with the ordinary, popular meaning of the term "finder's fee." (*Id.* ¶ 19.) Plaintiffs dispute that assertion and state that McDaniel believed that he received a finder's fee; that Kinkoph referred to it as a finder's fee; and that Will testified that the Defendants paid a $30,000 finder's fee to McDaniel. Pls.' Resp. to Defs.' Statement of Facts ¶ 19.

Lastly, Defendants assert that they were not aware that McDaniel was allegedly offering Underwood advice regarding Defendants purchase of Naylor's assets. Defs.' Statement of Facts ¶ 58. Plaintiffs, however, state that Will testified that, during due diligence period, he knew that McDaniel and Underwood were discussing the sale to the Defendants. Pls.' Resp. to Defs.' Statement of Facts ¶ 58.

As an aside, Plaintiffs also show via Underwood's affidavit that "[h]ad [Underwood] not been relying upon [McDaniel]'s representations and counsel, nor upon any other opportunities

with Invacare, [he] would have required a purchase price of at least $3 million for the assets of Naylor." Pls.' Resp. to Defs.' Statement of Facts ¶ 8. And, "[i]f Defendants had failed to agree to pay at least $3 million, [he] would not have sold [his] business to [Defendants], and [he] would have continued to profit from the operation of Naylor." (*Id.*)

**Notice Letter Regarding Unpaid Accounts Receivable and Breaches of Representations and Warranties**

As mentioned above, the Asset Purchase Agreement also included the fact that Underwood agreed to "repurchase from [Defendants]" any unpaid and uncollected accounts receivable at the option of the Defendants. Defs.' Statement of Facts ¶ 28. Defendants contend that Underwood is in violation of this provision because Underwood refuses to repurchase from the Defendants unpaid accounts receivables in the amount of $70,824. (*Id.* ¶ 41.)

Defendants also state that after the closing they began to learn that Plaintiffs made misrepresentations regarding certain customers' willingness to continue doing business with Naylor.[3] (*Id.* ¶ 38.) In addition, Defendants state they learned that Underwood had encouraged some of these customers to continue doing business with Naylor until the sale closed, in violation of the representations and warranties contained in the Asset Purchase Agreement.[4] (*Id.* ¶ 39.)

On January 30, 2009, Defendants sent Underwood a demand letter for the unpaid account receivables, also referencing the breaches of the Plaintiffs' representations and warranties (the "Notice Letter"). (*Id.* ¶ 42.) The Notice Letter provided that Plaintiffs failed to disclose material

---

[3] On December 3, 2010, this Court granted the Plaintiffs'/Counter-Defendants' Motion for Summary Judgment on these claims asserted by the Defendants.

[4] *Id.*

information and made materially inaccurate representations to the Defendants in breach of the Asset Purchase Agreement. (*Id.* ¶ 43.) The Notice Letter also provided that "[i]f [Plaintiffs] do not comply with their responsibilities outlined above within 10 days of this letter, . . . [Defendants] will take steps to protect [their] legal interests in this matter." (*Id.* ¶ 44.) In the Notice Letter, which was also sent to First Tennessee, Defendants demanded that the $380,000 held in escrow be turned over to them and that the balance of the Defendants' damages be paid by Underwood. (*Id.* ¶ 45.)

Defendants state that Underwood responded to the Notice Letter by demanding the Defendants immediately return certain Naylor equipment that Plaintiffs left in the possession of the Defendants following the asset purchase–specifically, a number of enclosure beds and related parts. (*Id.* ¶ 46.)

On the other hand, Plaintiffs contend that they responded to the Notice Letter via a letter from their attorney that expressed surprise about the contents of the Notice Letter and denied breach of the Asset Purchase Agreement. Pls.' Resp. to Defs.' Statement of Facts ¶ 46. Additionally, the response expressed concerns about defamation of Underwood and Naylor to First Tennessee and demanded Defendants cease and desist any activity which may further injure Underwood and Naylor and their reputations in the community. (*Id.*) Furthermore, the response also stated that Underwood would begin evaluating Defendants' allegations and requested a legible electronic copy and a detailed breakdown of the manner of calculating Defendants' damages. (*Id.*) Lastly, the response advised that to respond to Defendants' allegations, Underwood must be made aware of the actual contractual provisions alleged to be breached and the facts that lead Defendants to make the allegations. (*Id.*) Plaintiffs note that they have yet to

receive any documents that allow them to verify the existence of the unpaid balance of any accounts receivable.[5]  (*Id.* ¶ 41.)

**Enclosure Beds**

On a different note, during the negotiation of the asset purchase, Defendants decided not to purchase enclosure beds from the Plaintiffs, and, as such, the beds were omitted from the Asset Purchase Agreement.  Defs.' Statement of Facts ¶ 47.  Plaintiffs, however, add that Defendants were aware that the enclosure beds were required to be held as part of the portfolio offered to Naylor's clients.  Pls.' Resp. to Defs.' Statement of Facts ¶ 47.  Accordingly, Plaintiffs assert that Defendants requested that Underwood leave the enclosure beds so that Defendants could have unrestricted access to them.  (*Id.*)

Underwood did leave the enclosure beds at Naylor's Nashville and Memphis facilities; however, Defendants contend that Underwood left the beds with the understanding that he could pick them up at any time.  Defs.' Statement of Facts ¶ 48.  Plaintiffs, on the other hand, submit that whenever Underwood attempted to retrieve the enclosure beds, the Defendants, through their employee, Jason Dragavon ("Dragavon"), would advise Underwood that the beds were unavailable as they were being used by the Defendants' client.  Pls.' Resp. to Defs.' Statement of Facts ¶ 48.  Moreover, Plaintiffs assert that when Naylor resorted to the use of his attorney to attempt to retrieve the enclosure beds, Defendants would inaccurately state the number of beds available for Underwood to pick up, and then when Underwood would attempt to retrieve the

---

[5]  Plaintiffs state that as of December 17, 2010, Plaintiffs have received no information on the disputed accounts receivables from the Defendants.  Pls.' Resp. to Defs.' Statement of Facts ¶ 41.

beds, Defendants employees would respond that some were on rent to Defendants' customers and were therefore unavailable to Underwood.  (*Id.*)

In February 2009, after receiving the Notice Letter, Underwood demanded that Defendants pay the full rental rate for the equipment, for a total of $99,900.  Defs.' Statement of Facts ¶ 50.  Underwood also demanded that he be permitted to retrieve the enclosure beds from Defendants' facilities, which, Defendants say, occurred shortly thereafter.  (*Id.* ¶ 51.)  Plaintiffs, however, state that Defendants did not allow immediate retrieval, and that Defendants continued to rent some of Naylor's enclosure beds until at least March 11, 2009.  Pls.' Resp. to Defs.' Statement of Facts ¶ 51.

Defendants assert that Underwood understood and accepted the fact that the Defendants would keep possession of the enclosure beds, as he testified as follows:

> Q.    When you left after six months with Invacare, did you make demand on Invacare to return the beds to you?
> A.    No.  I thought they were on rent.
> Q.    What do you mean?
> A.    I was making money.

Defs. Statement of Facts ¶ 52.  Plaintiffs note that Underwood understood that the Defendants were renting the enclosure beds from Underwood and would pay Underwood at some point in the future.  Pls.' Resp. to Defs.' Statement of Facts ¶ 52.

Underwood also testified that he did discuss a fee-splitting arrangement with the Defendants where he would be paid fifty percent of the revenues Defendants received on the enclosure beds.  Defs.' Statement of Facts ¶ 53.  Plaintiff, however, adds that Underwood never agreed to a fee-splitting arrangement and no agreement was ever reached between the

Defendants and Plaintiffs as to a fair rental price for Defendants' use of Naylor's beds. Pls.'

Resp. to Defs.' Statement of Facts ¶ 53.

**Underwood's Consulting Agreement**

Apart from the asset purchase, Defendants also agreed to hire Underwood as a consultant

for a six-month period following the acquisition, memorialized in a Consulting Agreement

executed by Defendants and Underwood. Defs.' Statement of Facts ¶ 35. Defendants state that

the purpose of the consulting arrangement was for Underwood to assist in transitioning former

Naylor customers to becoming Defendants customers. (*Id.* ¶ 36.) Defendants were not satisfied

with Underwood's efforts in that regard, and his Consulting Agreement was not renewed. (*Id.* ¶

37.)

Plaintiffs state that the Consulting Agreement did not in any way require Underwood to

assist in transitioning former Naylor customers to becoming Defendants' customers. Pls.' Resp.

to Defs.' Statement of Facts ¶ 36. In fact, Plaintiffs cite the exact language of the Consulting

Agreement:

> During the Term, Consultant agrees to render consulting and sale services including
> but not limited to the following: (a) train Buyer's employees on the computer and
> accounting systems of the Business; (b) familiarize Buyer with employee
> strengths/weaknesses and characteristics of key customers and suppliers; (c)
> introduce Buyer to customers and suppliers; (d) assist Buyer in ownership transition
> relative to employee relations; (e) train Buyer's employees on billing and collection
> matters; (f) assist Buyer in further developing and increasing rentals to hospitals and
> acute care facilities in Tennessee, Mississippi and such other geographic areas as
> Buyer and Consultant may reasonably agree; and (g) perform such other tasks as
> Buyer and Consultant must reasonably agree.

(*Id.*) Further, Plaintiffs state that Defendants never notified Underwood that they were

dissatisfied with his consulting services or any other matters. (*Id.* ¶ 37.)

**Statements Made About Underwood**

On a wholly different note, Defendants additionally point out that Underwood testified that someone within the Defendants' company told Charles Bell ("Bell"), a business acquaintance of Underwood, that Underwood "knew that the business was going away when he sold the company." Defs.' Statement of Facts ¶ 54. Similarly, Defendants also point out that Underwood testified that Will told Jerry May ("May"), another acquaintance of Underwood, that "we paid over $2 million for [Underwood's] company and it was worth only about 800,000," and that Will "made it clear" that he "doesn't want to have anything to do with anybody that does any business with Allen Underwood." (*Id.* ¶ 55.) And, lastly, that Underwood testified that he was defamed by the Notice Letter to First Tennessee. (*Id.* ¶ 56.)

Defendants state that Underwood unequivocally testified that he suffered no actual harm resulting from these statements:

> Q.    What I want to know is, have you suffered any concrete, measurable losses
>        or inability to do business because of these alleged statements?
> A.    As of today, no.

(*Id.* ¶ 57.)

Plaintiffs dispute the characterization of Underwood's testimony and state that Underwood has been damaged. Pls.' Resp. to Defs.' Statement of Facts ¶ 57. Plaintiffs highlight the fact that May testified that Defendants have intended to "keep [Underwood] out of the medical equipment business altogether." (*Id.*) Additionally, Plaintiffs add that Underwood is no longer able to apply to First Tennessee for a loan, and, the fact that via affidavit Underwood testified that:

> The allegations made by Invacare hurt my reputation and cause me severe stress,
> anguish, sleep loss, constant worrying, weight loss, to be distracted from my family,

13

finances and other business opportunities, and constant emotional distress. The allegations made by Invacare. They also contributed to fights with my wife and marital problems.

(*Id.*)

In this Motion, Defendants' seek summary judgment on all of Plaintiffs' claims. Defendants argue that Plaintiffs cannot offer evidence sufficient to establish essential elements of each claim.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that the

court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[6]

In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.[7] When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[8] It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[9] These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a

---

[6] Fed. R. Civ. P. 56(a). The new text of Rule 56(a) became effective December 1, 2010. According to the official comments following Rule 56, "[t]he standard for granting summary judgment remains unchanged."

[7] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[8] *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[9] *Matsushita*, 475 U.S. at 586.

verdict.[10]  When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[11]

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[12]  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action."[13]  Finally, the "judge may not make credibility determinations or weigh the evidence."[14]

## ANALYSIS

Plaintiffs' Second Amended Complaint alleges six causes of action: breach of contract, intentional misrepresentation, fraud, conversion, defamation, and violations of the Tennessee Consumer Protection Act ("TCPA").  The Defendants argue that summary judgment should be granted as to all six claims.  The Court will discuss each of these claims separately.  The Court notes that both parties cite to Tennessee law and do not dispute that the substantive law of Tennessee applies in this matter.

I.     **Breach of Contract**

---

[10] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[11] *Id*. at 251-52 (1989).

[12] *Celotex*, 477 U.S. at 322.

[13] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[14] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

Plaintiffs allege Defendants breached two contractual obligations contained in the Asset Purchase Agreement. First, Plaintiffs allege that Defendants breached the Asset Purchase Agreement by failing to pay the full purchase price due under the Agreement and by refusing to permit disbursement of the Escrow Funds to Plaintiffs. Second, Plaintiffs allege that Defendant breached the Asset Purchase Agreement because the Defendants were obligated to and did pay a finder's fee to McDaniel.

### a. Breach of the Escrow Provision of the Asset Purchase Agreement

Defendants argue that their payment of funds fully complied with the Asset Purchase Agreement and that their refusal to release the Escrow Funds was not a breach of that Agreement. Defendants state that, according to the express terms of the Escrow Agreement, they had the right to notify First Tennessee of any claim they had under the Asset Purchase Agreement and that under the terms of the Asset Purchase Agreement, First Tennessee may not disburse the Escrow Funds until that claim is resolved. Defendants further contend that even if the refusal to permit disbursement of the Escrow Funds was a breach of some duty, that Plaintiffs can demonstrate no damages, an essential element of a breach of contract claim. Specifically, Defendants state that the Escrow Agreement provides that First Tennessee will distribute the Escrow Funds in accordance with the judgment of this Court; such that, if the Defendants are unsuccessful in this matter, the funds will be distributed to Plaintiffs, along with the interest accrued on those funds, and Plaintiff can claim no further damages from any alleged breach. Therefore, Defendants argue that summary judgment should be granted on this breach of contract claim.

Plaintiffs agree that the Defendants had the contractual right to notify First Tennessee of a claim they have under the Asset Purchase Agreement. Plaintiffs, however, state that Tennessee law implies in every contract a duty of good faith and fair dealing and that Defendants breached this duty by making an unsupported claim, namely, that Plaintiffs breached representations and warranties found in the Asset Purchase Agreement. Furthermore, Plaintiffs submit that they can prove damages. Specifically, Plaintiffs state that they have several certain and easily ascertainable elements to their damages claim: 1. the amount held in escrow, $380,000; 2. the claim for prejudgment interest at 10%; and 3. litigation costs and attorney's fees as stipulated under paragraph 8.2 of the Asset Purchase Agreement. For those reasons, Plaintiffs submit that summary judgment is inappropriate for this claim.

Under Tennessee common law, "[t]he essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract."[15] With respect to awarding damages for a breach of contract, Tennessee courts have explained that:

> The purpose of assessing damages in the event of a breach of contract is to place the injured party in the same position it would have been in had the contract been fully performed. The mere fact a party breaches a contract does not entitle the other party to an award of damages. The injured party must sustain damages that consequently result from the breach. Moreover, the injured party is not entitled to profit from the breach or be placed in a better position than had the contract been fully performed.[16]

---

[15] ARC Life Med, Inc. v. AMC-Tennessee, Inc., 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005).

[16] Metro. Gov't of Nashville & Davidson Cnty. v. Cigna, 195 S.W.3d 28, 35 (Tenn. Ct. App. 2005) (citations omitted).

Additionally, in Tennessee, a duty of good faith and fair dealing is imposed in the performance and enforcement of every contract.[17] The purpose of this implied covenant is "(1) to honor the reasonable expectations of the contracting parties and (2) to protect the rights of the parties to receive the benefits of the agreement into which they entered."[18] Importantly, whether a party acted in good faith is a question of fact.[19]

In the present case, viewing the evidence in the light most favorable to the Plaintiffs, this Court finds that summary judgment is not appropriate for this claim. The question of whether the Defendants acted in good faith in making the claims to First Tennessee is a question of fact, and, according to the briefings, this question is clearly in dispute. At this point in the litigation, this Court may not make credibility determinations or weigh the evidence. Additionally, this Court finds that the Plaintiffs have alleged damages sufficient to withstand this Motion. Therefore, for these reasons, summary judgment is **DENIED** as to this claim.

### b. Breach of the Brokers and Finders Provisions of the Asset Purchase Agreement

With respect to this claim, the Defendants argue that they did not breach the Asset Purchase Agreement because they in fact did not use a broker or finder in connection with the acquisition of Naylor. Defendants emphatically state that McDaniel did not act as a finder or broker for the Defendants. Defendants also submit that if Underwood contends that any representation made by the Defendants was false based on McDaniel's relationship with the

---

[17] Lamar Adver. Co. v. By-Pass Partners, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009) (citing Wallace v. Nat'l Bank of Commerce, 938 S.W.2d 684, 686 (Tenn. 1996).

[18] Lamar Adver. Co., 313 S.W.3d at 791.

[19] *Id.*

Defendant, Underwood waived any right to assert the breach of that representation by entering into the Asset Purchase Agreement with full knowledge of the relationship. Moreover, Defendants state that the undisputed facts show that Defendant did not pay a finder's fee to McDaniel or anyone else in connection with the purchase of Naylor's assets. In fact, Defendants state that McDaniel did received a $30,000 bonus days before the closing; however, they argue that the bonus does not violate the finder's fee provision, as it was not a finder's fee. Finally, defendants argue that Plaintiffs cannot establish that the bonus paid to McDaniel had any causal relationship to their alleged damages and cannot support their damages calculations. Consequently, Defendants argue that summary judgment is appropriate on this claim.

Plaintiffs, on the other hand, state that there is no dispute that McDaniel was a finder, or at a minimum, there are at least disputes of material fact regarding whether he was one. Additionally, Plaintiffs contend that Underwood did not have full knowledge of the relationship between McDaniel and the Defendants, and, thus, did not waive any right to assert the breach of that representation. Moreover, Plaintiffs argue that McDaniel was paid a finder's fee, as Defendants' own employees considered the compensation paid to McDaniel to be a finder's fee. Lastly, Plaintiffs state that there is proof of damages. Particularly, Plaintiffs highlight that Underwood testified that had he not been relying on the advice of McDaniel, he would not have settled for a sales price of $2.1 million; rather, he would have required a purchase price of $3.0 million. Therefore, Plaintiffs argue that summary judgment is not appropriate on this claim.

Viewing the evidence in the light most favorable to the Plaintiffs, this Court finds that summary judgment is not appropriate for this claim. The Asset Purchase Agreement states that: "No broker or finder has acted for Buyer . . . in connection with this Agreement . . . and no

broker or finder retained by Buyer . . . is entitled to any brokerage or finder's fee with respect to this Agreement."[20]  The questions regarding whether McDaniel was a finder and whether McDaniel was paid a finder's fee are questions of material fact for this breach of contract claim and are both clearly in dispute.  Again, on motions for summary judgment, this Court may not make credibility determinations or weigh the evidence.  Moreover, this Court finds that the Plaintiffs have alleged damages sufficient to withstand this Motion.  Therefore, summary judgment is **DENIED** as to this claim.

## II.    Intentional Misrepresentation and Fraud

Plaintiffs alleged claims of both intentional misrepresentation and fraud.  Plaintiffs assert that Defendants intentionally misrepresented/fraudulently misrepresented to Plaintiffs  that they would not pay a finder's fee to McDaniel as a result of the Defendants purchasing Naylor's assets.  Because the Tennessee Supreme Court has noted that the "terms 'intentional misrepresentation,' 'fraudulent misrepresentation' and 'fraud' are synonymous",[21] this Court will treat these two alleged causes of action collectively.

Defendants argue that summary judgment should be granted because the Plaintiffs cannot sufficiently support the essential elements of their claim.  First, Defendants note that all of the arguments discussed with respect to the alleged breach of the brokers and finders provisions of the Asset Purchase Agreement are applicable here as well.  Second, Defendants state that although Plaintiffs allege that Defendants represented that it "would not pay a finder's fee to

---

[20]  Asset Purchase Agreement § 5.2.4.

[21]    Gardner v. Anesthesia & Pain Consultants, P.C., No. E2003-03027-COA-R3-CV, 2004 WL 2715304, at *5 n.1 (Tenn. Ct. App. Nov. 30, 2004) (citing Concrete Spaces, Inc. v. Sender, 2 S.W.3d 901, 904 n.1 (Tenn. 1999)).

Scott McDaniel," that the allegation is "simply false." Defendants argue that they did not make any misrepresentations with respect to the general involvement of brokers or finders in this transaction. Third, Defendants state that Plaintiffs cannot provide sufficient proof to support their damage calculation. And, fourth, Defendants state even if the bonus to McDaniel was a finder's fee in violation of the provision, that Plaintiffs have no evidence that Defendants intended to induce any reliance by the Plaintiffs–one of the essential elements for a claim of intentional misrepresentation. To highlight this point, Defendants state that they decided to pay the bonus long after the purchase price had already been set and agreed to by the parties and that they were unaware that McDaniel was offering any advice to Underwood regarding the negotiations. Therefore, the Defendants assert that there is no evidence that Defendants intended to misrepresent McDaniel's bonus to Plaintiffs so that he would agree to a purchase price, and, as such, Defendants state that summary judgment should be granted on the intentional misrepresentation claim.

Plaintiffs, however, argue that there are numerous disputed material facts indicating intentional misrepresentation by the Defendants. First, Plaintiffs state that while it is true that McDaniel's name is not in the Asset Purchase Agreement, a good faith reading can only conclude that Defendants promised that no one, including McDaniel, received a finder's fee. Second, Plaintiffs argue that Defendants did intend to induce reliance on the no finder's fee provision in the Asset Purchase Agreement. To prove this point, Plaintiffs' highlight the fact that Defendants' employees discussed a finder's fee months prior to closing. Moreover, Plaintiffs state that the only thing that changed regarding the finder's fee immediately prior to closing was the form of the finder's fee. And, Plaintiffs note that Will admitted to knowing

McDaniel was discussing the sale of Naylor with Underwood. Therefore, the Plaintiffs argue that summary judgment should not be granted in this instance.

In Tennessee, to prove a claim based on intentional misrepresentation, a plaintiff must show that:

> (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of the misrepresentation.[22]

For the reasons this Court denied summary judgment as to the alleged breach of the brokers and finders provisions, the Court finds that summary judgment should not be granted due to a lack of evidence or disputed facts for elements one, two, three, four and six needed to prove a claim of intentional misrepresentation. The Court, however, will discuss element five, "plaintiff reasonably relied on the misrepresented material fact," in more detail.

The Tennessee Supreme Court has recently held that "[w]hether a person's reliance on a representation is reasonable generally is a question of fact requiring the consideration of a number of factors."[23] The factors include:

> [T]he Plaintiff's sophistication and expertise in the subject matter of the representation, the type of relationship–fiduciary or otherwise–between the parties, the availability of relevant information about the representation, any concealment of the misrepresentation, any opportunity to discover the misrepresentation, which party initiated the transaction, and the specificity of the misrepresentation.[24]

---

[22] Walker v. Sunrise Pontiac-GMC Truck, Inc., 249 S.W.3d 301, 311 (Tenn. 2008).

[23] Davis v. McGuigan, 325 S.W.3d 149, 158 (Tenn. 2010).

[24] *Id.*

Here, Defendants introduced the fact that they did not decide to pay the bonus to McDaniel until days before the Asset Purchase Agreement was executed and the fact that they were unaware that McDaniel was allegedly offering any advice to Underwood to negate the reasonable reliance element of the Plaintiffs claim. In response, however, Plaintiffs point to evidence in the record to prove the reasonable reliance element. Specifically, Plaintiffs state that Defendants' employees were discussing a finder's fee months prior to closing and that Will admitted to knowing that McDaniel discussed the sale of Naylor with Underwood. With these facts and because the question of whether the fifth element is met is a question of fact, the Court finds that the Plaintiff has made a showing sufficient to establish the existence of the fifth element essential to this claim. Moreover, this Court finds that the facts material to this fifth element are in dispute. Therefore, because this Court cannot make credibility determinations or weigh the evidence at this stage in the litigation, the Court finds that summary judgment is **DENIED** as to the intentional misrepresentation/fraud claims.

## III. Conversion Claims

Plaintiffs allege that Defendants converted the remaining monies due under the Asset Purchase Agreement by prohibiting First Tennessee from releasing the funds. Plaintiffs further allege that Defendants also converted the enclosure beds owned by Plaintiffs. Defendants argue that Plaintiffs cannot support the necessary elements of a these conversion claims.

Under Tennessee law, conversion "is the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights."[25] A party seeking to make out a prima

---

[25] State ex rel. Paula Flowers v. Tennessee Coordinated Care Network, et al., No. M2003-01658-COA-R3-CV, 2005 WL 427990, at *7 (Tenn. Ct. App. Feb. 23, 2005).

facie case of conversion must prove: "(1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights."[26]  To constitute conversion, the defendant must intend to convert the plaintiff's property.[27]

### a.    Escrow Funds

Defendants argue that pursuant to the Asset Purchase Agreement and the Escrow Agreement, they had a contractual right to notify First Tennessee not to release the funds and, thus, that Defendants' exercise of that right cannot constitute conversion.  Additionally, Defendants state that they have not appropriated the escrow funds, have not used or benefitted from the funds, and have not exercised dominion over the funds.  Defendants state that the funds remain in escrow with First Tennessee.  Consequently, Defendants argue summary judgment should be granted on this conversion claim.

Plaintiffs, on the other hand, argue that Defendants are converting the funds for their own use and benefit because they are seeking the payment of those funds to themselves.  Additionally, Plaintiffs state that a converting party does not need to have physical custody of funds to exercise dominion over those funds.

Reviewing the facts in the light most favorable to the Plaintiff, this Court finds that Plaintiffs fail to make a showing sufficient to establish the essential elements of this claim.  Specifically, Plaintiffs fail to show "the appropriation of another's property to one's own use and

---

[26]  *Id.*

[27]  Thompson v. Thompson, No. W2008-00489-COA-R3-CV, 2009 WL 637289, at *14 (Tenn. Ct. App. March 12, 2009).

benefit." Although the Plaintiffs state that this element is met because the Defendants "are seeking payment of those funds to themselves," the record reflects and the Plaintiffs do not dispute, that these funds are being held in escrow pursuant to the Asset Purchase Agreement and the Escrow Agreement. Plaintiffs do not explain, and the Court cannot decipher, how this money is being used for the Defendants own use and benefit. As such, the Plaintiffs have failed to prove this necessary element of a conversion claim. Accordingly, summary judgment is **GRANTED** as to this claim.

### b. Enclosure Beds

Defendants state that this conversion claim is likewise unsupported by any evidence. Defendants state that Plaintiffs admit they did not demand the return of the beds until February 2009 and that they were able to retrieve all of the beds shortly thereafter. Additionally, Defendants state that Plaintiffs have waived any claim of conversion as the Plaintiffs' knowledge of the Defendants' use of the beds combined with the Plaintiffs' acquiescence in the conduct constitutes a waiver of a claim for conversion. Furthermore, Defendants contend that the damages demanded by Plaintiffs are based on Naylor's rental rate of $25 per bed per day. Defendants assert that this calculation is unsupported as Underwood admitted to knowing he would be paid a percentage of the Defendants' revenues and did not express disagreement with that fee-splitting arrangement.

Plaintiffs, on the other hand, state that they attempted to retrieve the beds, but were thwarted by the Defendants. Plaintiffs assert that Defendants needed the beds to have them available in case a customer desired to rent one and that to date, Defendants have not paid for

those beds.  Further, Plaintiffs argue that they did not waive any claim for conversion; rather, Plaintiffs' allowance of Defendants' use of the property was conditioned on payment.

Viewing the evidence in the light most favorable to the Plaintiffs, the Court finds that the Plaintiffs, here, have made a showing sufficient to establish the existence of each element of this conversion claim.  The enclosure beds are property of the Plaintiffs, the Defendants have used the enclosure beds, the Plaintiffs have not been paid rent for the use of these beds, and there is a dispute of fact as to whether Plaintiffs were allowed to retrieve the beds when they demanded them.  Therefore, summary judgment is **DENIED** as to this claim.

### IV.   Defamation Claims

Plaintiffs alleged that Defendants defamed Underwood to First Tennessee and to others by making false statements that exposed Underwood to contempt and ridicule by third persons and have deprived Underwood of the benefit of the third parties' confidence.  Defendants argue that Plaintiffs cannot support the essential elements of their defamation claim.

The alleged defamatory statements, mentioned by the Defendant in their Motion, include:

1.   The Notice Letter sent by Defendants to First Tennessee.

2.   An employee of the Defendant told, Bell, a business acquaintance of Underwood, that Underwood "knew that the business was going away when he sold the company."

3.   Will told May, another acquaintance of Underwood, that "we paid over $2 million for [Underwood's] company and it was worth only about [$]800,000," and that Will "made it clear" that he "doesn't want to have anything to do with anybody that does any business with Allen Underwood."

Defendants argue that none of the alleged statements are defamatory because none rise to the level of public hatred, contempt, ridicule, or disgrace necessary for a claim of defamation

under Tennessee law. Furthermore, Defendants state that Underwood unequivocally testified that he has suffered no actual harm resulting from these statements.

Plaintiffs, on the other hand, argue that under Tennessee law, damage to Underwood's reputation is compensable. Additionally, Plaintiffs state that Underwood was greatly upset by the false allegations. Specifically, Plaintiffs note that Underwood was stressed and anguished, he sustained emotional distress, sleep loss, and weight loss, and the statements negatively affected his marriage.

The "basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in injury to the person's character and reputation."[28] To establish a prima facie case of defamation, the Tennessee Supreme Court has held that: "the plaintiff must prove that (1) a party published a statement; (2) with knowledge that the statement is false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement."[29] Furthermore, a recent Tennessee Court of Appeals decision noted that:

> "[a] written statement is not libel simply because the person who is the subject of the publication found it to be annoying, offensive, or embarrassing, but the words must be reasonably construed to hold the plaintiff up to public hatred, contempt or ridicule, and they must carry with them an element 'of disgrace.'"[30]

This Court will first discuss the Notice Letter, then address the verbal statements.

---

[28]  Quality Auto Parts, Inc. v. Bluff City Buick, Co., 876 S.W.2d 818, 820 (Tenn. 1994).

[29]  Sullivan v. Baptist Mem'l Hosp., 995 S.W.2d 569, 571 (Tenn. 1999).

[30]  Gard v. Harris, No. 2008-01939-COA-R3-CV, 2010 WL 844810, at *3 (Tenn. Ct. App. March 11, 2010).

As mentioned above, Defendants assert that the statements in the Notice Letter do not hold the Plaintiff up to the level of public hatred, contempt, or ridicule as mandated by Tennessee law. While the Plaintiffs, in their Response, did discuss the injury component of this defamation claim, they did not explain how this Notice Letter rose to the necessary standard under Tennessee law. Therefore, because the Plaintiffs did not dispute nor did they allege sufficient facts necessary to show that the Notice Letter held the Plaintiff up to the level of public hatred, contempt or ridicule necessary under Tennessee law, the Court finds summary judgment should be **GRANTED** as to the defamation claim regarding the Notice Letter.

As for the verbal statements, Defendants argue that the statements cannot again reasonably be construed to hold the Plaintiffs up to public hatred, contempt, or ridicule. The cases that Defendants cite, *Stones River Motors, Inc. v. Mid-South Publishing, Inc.*[31] and *Gard v. Harris*,[32] however, are specifically discussing libel, not slander. Plaintiffs do not discuss these statements specifically in their Response. Plaintiffs do generally state that "Underwood was greatly upset by the false allegations." The Court construes this statement to include both the Notice Letter and the verbal statements. The record, however, even with that statement, is entirely silent as to any evidence that the Defendants' employees either knew the statements to be false or were reckless or negligent in failing to ascertain whether the statements were false. Accordingly, because Plaintiffs lack sufficient evidence to establish the essential elements of this

---

[31] 651 S.W.2d 713, 719 (Tenn. Ct. App. 1983).

[32] No. 2008-01939-COA-R3-CV, 2010 WL 844810, at *3 (Tenn. Ct. App. March 11, 2010).

claim, this Court **GRANTS** summary judgment as to the defamation claim regarding the verbal statements.

## V. Violations of the Tennessee Consumer Protection Act

Defendants also move for summary judgment on the Defendants' Tennessee Consumer Protection Act ("TCPA") claim. The TCPA creates a cause of action for "[a]ny person who suffers an ascertainable loss of money or property . . . as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by" the TCPA.[33] Specifically, Plaintiffs allege violations of Tennessee Code Annotated ("TCA") sections 47-18-104(b)(8) and (27) and treble damages for these violations. These provisions read as follows:

> (b) . . . the following unfair or deceptive acts or practices affecting the conduct of any trade or commerce are declared to be unlawful and in violation of this part:
>
> > (8) Disparaging the goods, services or business of another by false or misleading representations of fact;
> >
> > (27) Engaging in any other act or practice which is deceptive to the consumer or to any other person[.]

With regard to Plaintiffs' claim pursuant to TCA section 47-18-104(b)(8), Defendants assume, in their Motion, Plaintiffs rely on the statements they identified as defamatory to support this disparagement claim. Plaintiffs, however, did not allege in their Response nor in their Second Amended Complaint any facts to specifically support a claim under this section nor did they even discuss this claim in their Response. Therefore, even viewing the evidence in the light most favorable to the Plaintiffs, because the Plaintiffs have not put forth any evidence to support

---

[33] Tenn. Code Ann. § 47-18-109(a)(1).

the claim, this Court **GRANTS** summary judgment as to any claim made pursuant to section 47-18-104(b)(8).

In regard to the claims made pursuant to section 47-18-104(b)(27), Defendants assume, in their Motion, that the deceptive practice claim is based on allegations regarding the finder's fee provision. Defendants state that summary judgment should be granted for the reasons discussed in all of the prior claims. Further, Defendants contend that Plaintiffs cannot be awarded additional damages for the same alleged conduct, except to the extent they can prove entitlement to treble damages, and that, here, Plaintiffs cannot demonstrate any willful or knowing deceptive acts by the Defendants. Consequently, Defendants contend summary judgment is appropriate for this claim.

In their Response, Plaintiffs state that the fact that Defendants represented in the Asset Purchase Agreement that a finder's fee was not paid and the claims Defendant made to First Tennessee violated the TCPA as unfair and deceptive. Specifically, Plaintiffs state that Defendants represented in the Asset Purchase Agreement that a finder's fee was not paid, and the person who was advising Underwood on the sale of Naylor did receive a finder's fee based on the successful closing of the transaction. Moreover, Plaintiffs assert that the claim made to First Tennessee violated TCPA as unfair and deceptive for the same reasons it violated the covenant of good faith and fair dealing, namely, that Defendants have no admissible evidence to support the claim and did not properly investigate the truth of the claim prior to denying Plaintiffs from their contracted sales price. Consequently, Plaintiffs argue that summary judgment should be denied as to this claim.

According to the Tennessee Supreme Court, the TCPA does not impose a single standard applicable to all cases for determining whether a particular act or practice is deceptive for the purpose of Tennessee Code Annotated § 47-18-104(b)(27).[34] The Tennessee Supreme Court, however, has defined both "deceptive" and "unfair":

> A deceptive act or practice is a material representation, practice or omission likely to mislead a reasonable consumer. An act is unfair if it causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.[35]

Moreover, "[t]o be considered deceptive, an act is not necessarily required to be knowing or intentional. Negligent misrepresentation may be found to be a violation of" the TCPA.[36] Upon finding that a party violated the TCPA, "i[f] the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper."[37]

For the reasons this Court set forth above for denying summary judgment as to both of the breach of contract claims and the intentional misrepresentation claim, this Court **DENIES** summary judgment as to the claims made pursuant to Tennessee Code Annotated § 47-18-104(b)(27).

---

[34] Fayne v. Vincent, 301 S.W.3d 162, 177 (Tenn. 2009).

[35] Davis v. McGuigan, 325 S.W.3d 149, 162 (Tenn. 2010) (citations omitted).

[36] *Id.*

[37] Tenn. Code Ann § 47-18-109(a)(3).

31

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is

**GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

> **s/ S. Thomas Anderson**
> S. THOMAS ANDERSON
> UNITED STATES DISTRICT JUDGE
>
> Date: January 3, 2011.