## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| **NAYLOR MEDICAL SALES & RENTALS, INC. and JERRY ALLEN UNDERWOOD,** | ) ) ) | |
| **Plaintiffs/Counter-Defendants,** | ) ) | |
| **v.** | ) ) | No. 09-2344-STA-cgc |
| **INVACARE CONTINUING CARE, INC., f/k/a HEALTHTECH PRODUCTS, INC., and INVACARE CORPORATION,** | ) ) ) ) | |
| **Defendants/Counter-Plaintiffs** | ) | |

_____

### BENCH MEMORANDUM
_____

On April 22, 2009, Plaintiffs Naylor Medical Sales & Rentals, Inc. ("Naylor") and Jerry Allen Underwood ("Underwood") (collectively "Plaintiffs") filed a Complaint in Shelby County Chancery Court asserting claims of breach of contract, conversion, defamation, and violations of the Tennessee Consumer Protection Act. Defendants Invacare Continuing Care, Inc. and Invacare Corporation (collectively "Defendants") filed a Notice of Removal (D.E. # 1) with this Court on June 2, 2009. Defendants then filed an Answer to Plaintiff's Complaint (D.E. # 3) on June 5, 2009. After receiving leave of this Court, Plaintiffs filed a Second Amended Complaint on May 25, 2010, asserting the additional claims of intentional misrepresentation and fraud. (D.E. # 54.)

The Court tried this civil action, without a jury, beginning on March 7, 2011. Following the trial, the parties filed proposed findings of fact and conclusions of law. Federal Rule of Civil Procedure 52 requires that, "[i]n an action tried on the facts without a jury . . . , the court must

1

find the facts specially and state its conclusions of law separately."[1]  In accordance with this

Rule, the Court finds and states the following:

## **FINDINGS OF FACT**

Defendants are in the business of manufacturing and distributing medical equipment.

Naylor was a health care equipment rentals company, a market in which Defendants sought to

expand their business.  Underwood was the President of Naylor.

In late 2006, Defendants and Underwood began discussing the sale of Naylor's assets.

During this time, Defendants were utilizing the services of Scott McDaniel ("McDaniel"), an

independent contractor hired by Defendants as a consultant in December 2006.  McDaniel had

experience in medical equipment rentals, and Defendants hired him to help develop their rental

division.

McDaniel introduced Underwood to the Defendants.  McDaniel was a close friend and

former business associate of Underwood.  Underwood knew that McDaniel was consulting for

the Defendants.  In fact, Underwood accompanied McDaniel to a meeting with Defendants in

Savannah Lakes in which McDaniel made a bed rental business proposal to Defendants.

Underwood knew that the business McDaniel was designing with Defendants would compete

with Naylor Medical; however, Underwood did not know the business was going to be in the

same geographical location as Naylor.

McDaniel's employment with Defendants is governed by a Consulting Agreement.  This

agreement provides that he is compensated through a flat monthly fee and a quarterly bonus

based on a percentage of Defendants' rental revenue.  Underwood knew that part of McDaniel's

---

[1] Fed. R. Civ. P. 52(a)(1).

compensation was the bonus or fee on his growth of Defendants' rental revenue.  As such, in the event that Defendants ultimately purchased Naylor, Underwood expected that McDaniel would be paid a bonus based on growing the revenue of Naylor.

From early 2007 to the actual time of acquisition, Defendants performed their due diligence and attempted to obtain all necessary information from Underwood to ascertain an appropriate purchase price for Naylor's assets.  On October 25, 2007, Defendants sent Underwood a Letter of Intent.  Part one of the Letter of Intent provided for a purchase price of between $1.8 million and $2.1 million, subject to the conditions set forth in the Letter of Intent and the results of the due diligence process.  On October 31, 2007, Plaintiffs and Defendants executed the Letter of Intent.

Prior to receiving the Defendants' offer in the Letter of Intent, Underwood had been approached by two other companies that were interested in acquiring Naylor.  One of these two companies offered Underwood $1 million for Naylor.

Defendants based their valuation of Naylor on a multiple of EBITDA (Earnings Before Interest Depreciation and Amortization) derived from the financial information provided by Underwood to Daryn Kinkoph ("Kinkoph"), the Controller for Defendants' Rental Division.  Underwood knew that Defendants were contemplating paying a multiple of EBITDA in the "four to five times range."

Based on the financial information given to Kinkoph by Underwood, Kinkoph calculated the EBITDA value of Naylor at $427,000.  Using a multiplier of five, Defendants assigned a maximum value of Naylor at $2.135 million.  There were multiple versions of Defendants' valuation document for Naylor.  These versions changed based on the information provided by

Underwood.  At one point, Defendants estimated an EBITDA for Naylor of $513,000 based on preliminary information, which was subsequently reduced to the final calculation of EBITDA at $427,000, based on an actual eleven (11) months of earnings and one month of estimated earnings for 2007.

During the months following the Letter of Intent, the parties exchanged offers and counter-offers.  Defendants had originally offered $1.9 million for Naylor's assets.  In the last of those exchanges, Underwood demanded the payment of $2.1185 million for his business.   The parties ultimately agreed on a purchase price of $2.1 million.  After this agreement, McDaniel testified that Underwood told him that he thought he had "skinned" the Defendants and that he had gotten a good deal.

Defendants' offer of $2.1 million to Plaintiffs was approved by Defendants' CEO Mal Mixon.  The offer was not presented to Defendants' board of directors for approval, and no approval of the board of directors was required.

On March 31, 2008, the parties signed the Asset Purchase Agreement ("APA").  Pursuant to the APA, Plaintiffs sold substantially all of the Naylor's assets to Defendants for the purchase price of $2.1 million.  Section 3.2 of the Asset Purchase Agreement detailed exactly how the purchase price was to be paid.  According to 3.2, the purchase price of $2.1 million would be paid to Plaintiffs in two steps:  first, Defendants were to wire $1,720,000 to Plaintiffs; and, second, Defendants were to deposit $380,000 into the Escrow Account "pursuant to the terms of the Escrow Agreement."

The Escrow Agreement, pursuant to which Defendants deposited $380,000 of the purchase price ("Escrow Funds"), explained that First Tennessee Bank ("First Tennessee") was

to be the escrow agent and directed First Tennessee to invest the Escrow Funds in a money market account.  The parties agreed to the deposit of the Escrow Funds in the event Defendants had a claim against Plaintiffs under the APA.

Section 3 of the Escrow Agreement specifically states that:

> From time to time on or before March 31, 2009 . . . , Buyer may give notice (a "Notice") to Seller and Escrow Agent specifying in reasonable detail the nature and dollar amount of any claim (a "Claim") it may have under the Purchase Agreement. If a Notice is given with respect to a Claim, Escrow Agent shall make payment with respect thereto only in accordance with (i) joint written instructions of Buyer and Seller or (ii) a final non-appealable order of a court of competent jurisdiction.

Pursuant to this agreement, absent a claim against the escrow funds by Defendants within twelve (12) months of the signing of the APA, the escrow funds were to be automatically released to Underwood on March 31, 2009.  To date, the Escrow Funds remain on deposit with First Tennessee and are approximately $385,000.

**Finder's Fee Provisions**

Section 5.2.4 of the Asset Purchase Agreement included the following representations: (1) that "[n]o broker or finder has acted for Buyer or its Affiliates in connection with this Agreement," and (2) that "no broker or finder retained by Buyer or its Affiliates is entitled to any brokerage or finder's fee."  Section 5.2.4 was not in the original draft of the APA prepared by Defendants, but was inserted by Underwood's attorney.  Additionally, section 5.2.6 of the APA provides in part that: "No representation or warranty by Buyer in this Agreement . . . contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading."  Section 5.2.6 was likewise not in the original draft of the APA prepared by Defendants, but was inserted by Underwood's attorney.

In March 2008, nearing the close of the Naylor deal, Chris Yessayan ("Yessayan"), Vice President of Invacare Partner Solutions, discovered an ambiguity in Defendants' contract with McDaniel. This ambiguity provided for the inclusion of the acquired revenue of acquisitions like Naylor in his quarterly bonus. Recognizing the issue, Yessayan and Mike Will ("Will"), Director of Rentals for Defendants and Defendants' point man for the acquisition, met with McDaniel at P.F. Chang's Restaurant in Memphis, Tennessee a few days before the March 31 closing date to discuss Defendants' solution to the ambiguity. Rather than paying McDaniel the quarterly bonus calculated on rental revenue, Defendants told McDaniel that they had decided to pay him a flat bonus of $30,000. McDaniel did not know of Defendants' decision to pay him the bonus until this meeting. McDaniel did not negotiate the amount of the bonus, as it was set unilaterally by Defendants, and he was not happy with the decision. McDaniel accepted the bonus.

For accounting reasons, Defendants called the bonus a "finder's fee" in order to allow Defendants to capitalize the expense in the purchase price and to avoid having to expense the cost against the operating income (or bottom line) of the new business. The $30,000 payment made by Defendants to McDaniel was referenced in several of Defendants' documents and was consistently referred to as a "finder's fee." Additionally, McDaniel, Will, and Kinkoph specifically testified in depositions to the $30,000 payment being a "finder's fee."

As early as February 5, 2008, Will believed that Defendants should disclose McDaniel's finder's fee to Underwood. In fact, Defendants internally discussed disclosing McDaniel's finder's fee to Underwood and Defendants decided not to do so.

Neither Defendants nor McDaniel advised Underwood that McDaniel was paid a $30,000 finder's fee. Underwood did not discover this information prior to closing. In fact, Underwood did not discover the payment of the finder's fee to McDaniel until almost two years after the sale of Naylor.

McDaniel described his involvement in Underwood's discussions with Defendants about the asset purchase as "very limited". McDaniel testified that he did not give Underwood any substantive advice regarding Defendants' purchase of Naylor's assets nor did he encourage Underwood to accept the deal or the purchase price offered by Defendants. McDaniel also testified that he did not recall Underwood telling him that, in his opinion, Naylor was worth upwards of $3 million.

Underwood, on the other hand, testified that he had advised McDaniel that he valued his company above $3 million, and that, in response, McDaniel told him that Defendants' Board of Directors had only approved $2.1 million and urged Underwood to consider the value of all of the other things that came along with a sale to Defendants. Underwood also testified that he spoke with McDaniel almost daily, and he relied on McDaniel's advice, in part, because McDaniel had experience with and had earlier sold his own larger medical equipment rental business.

Underwood stated that had he known that McDaniel was receiving a finder's fee, he would not have sold his business to Defendants for $2.1 million; instead, he would have changed the purchase price to something higher than $3 million. Additionally, Underwood stated that had Defendants refused to pay $3 million for Naylor, Underwood would have continued to operate Naylor at a profit of approximately $550,000 per year.

7

Underwood testified that in calculating the EBITDA value of Naylor, as mentioned above, Defendants did not add back Underwood's salary, insurance, 401k, the company car, travel expenses or other expenses typically added to individually owned companies. Had those items been added back, the EBITDA figure would have been higher. Based on Naylor's 2006 figures, Underwood calculated Naylor's EBITDA to be "right around $600,000" and using a "conservative factor of five," valued Naylor at $3 million or more.

**Consulting Agreement**

Apart from the asset purchase, Defendants also agreed to hire Underwood as a consultant for a six-month period following the acquisition, memorialized in a Consulting Agreement executed by Defendants and Underwood. Underwood testified that he agreed to the purchase price of $2.1 million based on the opportunity of future work with Defendants, "to be able to have a job in the future, you know, with benefits and all the other things and thinking about the great opportunities that me and [McDaniel] had at the time with a lift company." Underwood thought that, because Defendants had little experience in the rental market, Defendants would value his experience and that his Consulting Agreement might lead to future employment with Defendants.

The Consulting Agreement provided for a consulting period of one hundred and eighty (180) days, with no promise of any extension. The agreement also contained a "zipper clause" stating that it constituted the entire agreement of the parties as to the consulting services.

Underwood testified that he knew what he was doing when he signed the Consulting Agreement and that he was represented by counsel.

Defendants did not renew the Consulting Agreement after the one hundred and eighty day period.

**Escrow Account**

Section 7.6 of the APA provides:

Receivables.  Buyer shall use all reasonable efforts to collect the accounts receivable included in the Purchased Assets but Buyer shall not be required to take or threaten legal action to collect any such accounts receivable.  At the option of Buyer, Seller and the Shareholder jointly and severally agree to repurchased from Buyer, for an amount equal to the unpaid balance thereof, less any amount by which the Closing Net Book Value exceeds the Target Net Book Value (the "Excess") (as such may be reduced by the application of Section 8.4(b)), and which have not been paid within one hundred eighty (180) days after the date of the invoice, it being understood that Buyer shall exercise such option at any time after such date up to the first (1st) anniversary of the Closing Date without waiving any rights hereunder.  Seller shall have the right to verify the existence of the unpaid balance of any accounts receivable.

Section 8.2 of the APA provides as follows:

Indemnification of Buyer.  Buyer shall indemnify Seller and Shareholder . . . against and hold them harmless from (a) any and all loss, damage, liability or deficiency resulting from or arising out of any inaccuracy in or breach of any representation, warranty, covenant or obligation made or incurred by Buyer herein or in any other agreement, instrument, or document delivered by or on behalf of Buyer in connection herewith . . . and (c) any and all costs and expenses (including reasonable legal and accounting fees) related to any of the foregoing.

Section 8.4 of the APA provides as follows:

Survival; Limitations on Indemnification.  The indemnification of Buyer provided for under Section 8.1(a) shall be limited in certain respects as follows: (b) Neither Seller nor Shareholder shall be liable to Buyer for indemnification under this Agreement until the aggregate amount of indemnification claims exceeds the Excess (as such may be reduced by application of Section 7.6).  Thereafter, neither Seller nor Shareholder shall be liable to Buyer for indemnification under Section 8.1(a) until the aggregate amount of indemnification claims under Section 8.1(a) exceeds the Excess plus Fifty Thousand Dollars ($50,000) (the Indemnity Deductible), at which time, Seller and Shareholder shall be liable for the entire amount of all such indemnification claims which exceed the Indemnity Deductible, but in no event shall

Seller or Shareholder's liability exceed Nine Hundred Fifty Thousand Dollars ($950,000).

By a Notice Letter dated January 30, 2009, Defendants asserted a claim against the Escrow Funds held at First Tennessee.  The Notice Letter asserted a claim under Section 7.6 of the APA for unpaid accounts receivable.  Additionally, the Notice Letter also provided that Plaintiffs failed to disclose material information and made materially inaccurate representations to the Defendants in breach of the Asset Purchase Agreement.  Specifically, this Notice Letter indicated that Defendants had "become aware that at least three accounts to which [Plaintiffs were] renting products as of the Closing had previously indicated to [Plaintiffs] that they intended to cease doing business with [Defendants], and these three accounts have since carried out their previously-announced intention . . . ."

In the Notice Letter, Defendants demanded that the $380,000 held in escrow be turned over to it and that the balance of Defendants' damages be paid by Underwood.  Below are the facts regarding the unpaid accounts receivable and the accounts ceasing to do business with Defendants.

**Unpaid Accounts Receivable**

As mentioned above, pursuant to Section 7.6 of the APA, Plaintiffs "have the right to verify the existence of the unpaid balance of any accounts receivable" and Defendants were to use "all reasonable efforts" to collect accounts receivables.

Kinkoph testified that Defendants took reasonable steps to collect on the accounts receivable and in seeking repayment from Plaintiffs for the uncollected accounts receivable. Kinkoph testified that Defendants' collection efforts were hampered by the lack of information on the accounts that Underwood was to provide.

10

Underwood, on the other hand, testified that he, through his attorney, attempted to obtain from Defendants a readable spreadsheet for the unpaid accounts receivable as well as the unpaid invoice numbers and invoice dates.   And, that, even up to the date of trial, he had not received the requested information to back up the Defendants' claim with respect to unpaid accounts receivable.

The APA provides in Section 3.1 that the Target Net Book Value is $600,000.  The parties agreed that the equipment and other hard assets comprised $400,000 of the $600,000 Target Net Book Value.  Because Plaintiffs guaranteed $600,000 value and the parties agreed that the equipment was valued at $400,000, Plaintiffs only guaranteed the collection of $200,000 on the accounts receivable.  The "excess" is the amount by which the Closing Net Book Value exceeds the Target Net Book Value.  Plaintiffs receive credit for the amount by which the assets exceed $600,000.  In calculating the amount due Defendants from Underwood for unpaid accounts receivable, Underwood is entitled to a credit for the excess.

The numbers regarding the monies owed are in dispute.  In one exhibit presented to the Court by Plaintiffs, the numbers show that unpaid accounts receivable exist in the amount of $85,048.83 and the amount of the excess is $37,492.24.  In another exhibit presented to the Court by Defendants, the numbers show that unpaid accounts receivable exist in the amount of $85,048.83 and the amount of excess is $22,492.24 (Defendants note that the difference in this number reflects a $15,000 deduction made pursuant to an email from Underwood dated May 9, 2009).

In addition to the excess, Plaintiffs are entitled to a credit for the $50,000 deductible set forth in Section 8.4(b) of the APA.

**Accounts Ceasing to do Business with Defendants**

Several of Naylor's customers ceased doing business or significantly decreased their business with Defendants soon after the closing. These businesses include Select Medical (also referred to as Select Specialty) ("Select"), The Regional Medical Center ("The Med"), Methodist Hospital ("Methodist"), Kindred Hospital ("Kindred"), and Briley Nursing Home ("Briley"). Defendants state that after the closing they began to learn that Plaintiffs made misrepresentations regarding certain customers' willingness to continue doing business with Naylor.[2] The Defendants included these claims in the above mentioned Notice Letter to Plaintiffs and First Tennessee, which demanded the $380,000 held in escrow be turned over to Defendants. Details of each specific business entity mentioned are discussed below.

Regarding Kindred, Defendants note that Charles Nunn ("Nunn"), Materials Manager and Buyer for Kindred, testified that Kindred began transitioning toward using a national contract for rentals in 2007 and that he had advised Underwood of that transition at or around that time. Additionally, Nunn testified that he informed Jason Dragavon ("Dragavon"), an employee of Naylor and later of Invacare, of the national contract as well.

Plaintiffs note that approximately four months prior to the sale of Naylor, Will, an employee of Defendants, knew that Kindred was in the process of changing national accounts and that Nunn was getting pressure to use the national contract. Will discussed this situation in a series of emails with Underwood presented at trial and at a meeting with Dragavon and Underwood before Defendants purchased Naylor. Moreover, after the completion of the sale of

---

[2] On December 3, 2010, this Court granted the Plaintiffs'/Counter-Defendants' Motion for Summary Judgment on these claims asserted by the Defendants.

Naylor, Kindred continued to do business with Defendants, and the amount of rentals remained about the same as they had been with Naylor.  Neither before the completion of the sale nor at any time thereafter did Nunn tell Underwood or Dragavon or anyone else at Naylor that Kindred was going to stop doing business or decrease the amount of business with Naylor.  At some point after the sale, Kindred simply started calling Defendants less frequently.

With regard to the other four businesses, the Plaintiffs highlight the facts below.

After the sale of Naylor to Defendants, the amount of business that Briley did with Defendants increased.  Dragavon also serviced this account.  Briley then abruptly stopped doing business with Defendants.  The first notice Dragavon received of Briley's termination of Defendants was when Briley called requesting that Defendants' equipment be picked up.  Before the completion of the sale of Naylor, no one with Briley told Dragavon that it was terminating its business with Naylor or significantly decreasing the amount of business it did with Naylor.

While an employee of Naylor and Defendants, Brad Hays ("Hays") serviced the accounts for the Methodist facilities and The Med in Memphis.  At no time before the completion of the sale, did anyone, at any of these facilities, tell Hays that it was going to stop doing business with Naylor or decrease the amount of business it did with Naylor.  Plaintiffs submit that if these facilities did stop doing business with Defendants it was lost solely by Defendants because of bad service, lack of experience, bad luck, changes in service practices, billing errors, and competition.

As for Select, prior to the closing of the sale, the Freedom Medical contract was assigned to Defendants and covered the Select locations in Memphis and Nashville, Tennessee and Jackson, Mississippi.  Defendants were initially able to retain the business for Select in Memphis

and Jackson, but, ultimately lost that business.  Plaintiffs argue that Defendants lost the business of Memphis Select because of Defendants' dropping service times and failure to meet the expectations of the facility.

Underwood testified that the medical equipment rental business is extremely competitive, and a business has to fight to keep customers every day.

Defendants, on the other hand, note that individuals at each of these four companies advised Naylor or Underwood that their business would be going away in 2008.  Defendants, however, were uncertain as to the identity, customer location, and specific statements made.

**Enclosure Beds**

During the negotiation of the asset purchase, Defendants decided not to purchase enclosure beds from the Plaintiffs, and, as such, the beds were omitted from the Asset Purchase Agreement.  Defendants, however, were aware that the enclosure beds were required to be held as part of the portfolio offered to Naylor's clients.  Accordingly, Underwood left the enclosure beds at Naylor's Nashville and Memphis facilities.  Underwood testified that Defendants rented these beds with his full consent.  Additionally, Underwood testified that the enclosure beds were functional at the time that the sale closed and that spare parts were also left with the beds.

In February 2009, after receiving the Notice Letter, Underwood demanded that Defendants immediately return the enclosure beds and demanded that Defendants pay the full rental rate for the equipment, for a total of $99,900.  Defendants and Underwood had discussed a split revenue-sharing arrangement related to the enclosure beds, under which Plaintiffs would be paid fifty (50) percent of the revenues Defendants received on the beds.  Underwood, however, testified that he did not agree to this split revenue-sharing arrangement.

14

Defendants received approximately $14,000 in revenue from the rental of the enclosure beds.  After some back and forth, Defendants allowed Plaintiffs to retrieve the enclosure beds. Underwood testified that some of the beds had sustained some damage while in Defendants' care.

## CONCLUSIONS OF LAW

The Court notes that both parties cite to Tennessee law and do not dispute that the substantive law of Tennessee applies in this matter.

### I.    Breach of Contract

Plaintiffs allege Defendants breached contractual obligations contained in the Escrow Agreement and the APA.  First, Plaintiffs allege that Defendants breached the Escrow Agreement and APA refusing to permit disbursement of the Escrow Funds to Plaintiffs.  Second, Plaintiffs allege that Defendant breached the APA because the Defendants were obligated to and did pay a finder's fee to McDaniel.

Under Tennessee common law, "[t]he essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract."[3]  Additionally, in Tennessee a duty of good faith and fair dealing is imposed in the performance and enforcement of every contract.[4]  The purpose of this implied covenant is "(1) to honor the reasonable expectations of the contracting parties and (2) to protect the rights of the parties to receive the

---

[3]  *ARC Lifemed, Inc. v. AMC-Tennessee, Inc.,* 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005).

[4]  *Lamar Adver. Co. v. By-Pass Partners*, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009) (citing *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996).

15

benefits of the agreement into which they entered."[5]  Importantly, whether a party acted in good faith is a question of fact.[6]

The Court finds that the Defendants breached both of the aforementioned contractual obligations contained in the APA.

**a.    Breach of the Escrow Agreement and Escrow Provision of the Asset Purchase Agreement**

**i.    Escrow Agreement**

As mentioned above, according to Section 3 of the Escrow Agreement, Defendants "may give notice to [Plaintiffs] and Escrow Agent specifying in reasonable detail the nature and dollar amount of any claim it may have under the Purchase Agreement."  In Defendants' Notice Letter to Plaintiffs and First Tennessee, Defendants stated that they had "become aware that at least three accounts to which [Plaintiffs were] renting products as of the Closing had previously indicated to [Plaintiffs] that they intended to cease doing business with [Defendants] and these three accounts have since carried out their previously-announced intention . . . ."  Since that letter, Defendants have argued that five of Naylor's customers have actually either ceased doing business or significantly decreased their business with Defendants soon after closing.  These businesses include Select, The Med, Methodist, Kindred and Briley.

To prove this claim, Defendants cite two main pieces of evidence.  First, Defendants note that Nunn, an employee of Kindred, testified that he advised Underwood and Dragavon, an employee of Naylor, of Kindred beginning to transition toward using a national contract for

---

[5] *Lamar Adver. Co.*, 313 S.W.3d at 791.

[6] *Id.*

rentals in 2007.  Second, Defendants state that Defendants were also told by individuals at Select, The Med, Methodist, and Briley that they had advised Naylor or Underwood that the business would be going away in 2008.

Plaintiffs, however, refute these claims.  Plaintiffs show that approximately four months prior to the sale of Naylor, Will, Defendants' employee, knew that Kindred was in the process of changing national accounts and that Nunn was getting pressure to use the national contract.  Will even discussed this situation in a series of emails with Underwood and at a meeting with Dragavon and Underwood before Defendants purchased Naylor.  Moreover, Plaintiffs highlight the fact that Defendants were and still are uncertain as to the identity, customer location, and the alleged statements made by individuals at Select, The Med, Methodist, and Briley.

The Court found Underwood's testimony to be credible.  Underwood testified that the medical equipment rental business is extremely competitive and that a business has to fight to keep customers every day.  Underwood noted that it is not unusual in this type of business to lose and gain customers quickly and constantly.  Moreover, Defendants provided no evidence that Underwood or Naylor had any prior knowledge that customers would cease doing business after the closing on the asset purchase, with the exception of Kindred potentially having to use a national contract.

Consequently, weighing all of the evidence presented at trial, the Court finds the Defendants breached the duty of good faith and fair dealing imposed in the performance and enforcement of the Escrow Agreement.  Defendants did not prove via competent evidence that they had a good faith basis for making this claim against the Escrow Funds and, subsequently, they had no good faith basis for withholding these funds from Underwood for over two years.

### ii.     Asset Purchase Agreement

Section 7.6 of the APA provides that "[s]eller shall have the right to verify the existence of the unpaid balance of any accounts receivable."  Underwood testified that he, through his attorney, attempted to obtain from Defendants a readable spreadsheet for the unpaid accounts receivable as well as the unpaid invoice numbers and invoice dates.   And, that, even up to the date of trial, he had not received the requested information to back up the Defendants' claim with respect to unpaid accounts receivable.

Thus, the Court finds that Defendants breached Section 7.6 as Plaintiffs were unable to verify the existence of the unpaid balance of any accounts receivable.

### b.     Breach of the Brokers and Finders Provisions of the Asset Purchase Agreement

Section 5.2.4 of the APA includes the following representations: (1) that "[n]o broker or finder has acted for Buyer or its Affiliates in connection with this Agreement," and (2) that "no broker or finder retained by Buyer . . . is entitled to any brokerage or finder's fee."  Additionally, section 5.2.6 of the APA provides as follows:  "No representation or warranty by Buyer in this Agreement . . . contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading."  Moreover, according to Black's Law Dictionary, a "finder's fee" is defined as "[t]he amount charged by one who brings together parties for a business opportunity."

Defendants called the $30,000 payment to McDaniel a "finder's fee" and referenced the payment as such in internal documents.  Even McDaniel, Will, and Kinkoph testified via deposition to this $30,000 payment being a "finder's fee."  Moreover, the $30,000 payment to

McDaniel has all of the characteristics of a "finder's fee" as McDaniel introduced Underwood and Naylor to the Defendants.

Defendants do explain that they called the bonus a "finder's fee" to allow themselves to capitalize the expense in the purchase price and avoid having to expense the cost against the operating income.  Defendants also highlight the fact that McDaniel was not happy about taking this $30,000 lump sum payment.  Moreover, Defendants note that Underwood expected McDaniel to be paid a bonus based on growing the revenue of Naylor.

Taking all of these facts into account, the Court finds this payment to be a "finder's fee." Defendants internally referred to the payment as a finder's fee and, importantly, the payment had all of the characteristics of a finder's fee.  As such, the Court finds that Defendants breached Sections 5.2.4 and 5.2.6 of the APA.

## II.    Intentional Misrepresentation and Fraud

Plaintiffs assert that Defendants intentionally misrepresented/fraudulently misrepresented to Plaintiffs  that they would not pay a finder's fee to McDaniel as a result of the Defendants purchasing Naylor's assets.  Because the Tennessee Supreme Court has noted that the "terms 'intentional misrepresentation,' 'fraudulent misrepresentation' and 'fraud' are synonymous",[7] this Court will treat these two alleged causes of action collectively.

In Tennessee, to prove a claim based on intentional misrepresentation, a plaintiff must show that:

---

[7]    *Gardner v. Anesthesia & Pain Consultants, P.C.,* No. E2003-03027-COA-R3-CV, 2004 WL 2715304, at *5 n.1 (Tenn. Ct. App. Nov. 30, 2004) (citing *Concrete Spaces, Inc. v. Sender, 2 S.W.3d 901*, 904 n.1 (Tenn. 1999)).

(1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; and (6) plaintiff suffered damage as a result of the misrepresentation.[8]

The Tennessee Supreme Court has recently held that "[w]hether a person's reliance on a representation is reasonable generally is a question of fact requiring the consideration of a number of factors."[9] The factors include:

[T]he Plaintiff's sophistication and expertise in the subject matter of the representation, the type of relationship–fiduciary or otherwise–between the parties, the availability of relevant information about the representation, any concealment of the misrepresentation, any opportunity to discover the misrepresentation, which party initiated the transaction, and the specificity of the misrepresentation.[10]

The facts in this case have shown that Defendants, in the APA, represented that no finder's fee was paid. As detailed above, this representation was false when made. At the closing of the asset purchase, Defendants signed the APA representing that no finder's fee was paid while simultaneously referring to the $30,000 payment internally as a finder's fee. The false representation was in regard to a material fact. In fact, Plaintiffs' attorney specifically included the finder's fee provision in the APA. Moreover, at the very least, the false representation was made recklessly as the Defendants internally discussed disclosing McDaniel's finder's fee to Underwood, but ultimately decided not to do so. Underwood vehemently testified that he did rely on this misrepresented fact, and, importantly, he had no opportunity to discover

---

[8] *Walker v. Sunrise Pontiac-GMC Truck, Inc.,* 249 S.W.3d 301, 311 (Tenn. 2008).

[9] *Davis v. McGuigan,* 325 S.W.3d 149, 158 (Tenn. 2010).

[10] *Id.*

this misrepresentation.  As a result, the Plaintiffs sustained damages, which will be discussed below.

Therefore, the Court finds that Defendants intentionally misrepresented to Plaintiffs  that they would not pay a finder's fee as a result of the Defendants purchasing Naylor's assets.

## III.    Conversion Claims

Plaintiffs allege that Defendants converted the enclosure beds owned by Plaintiffs. Under Tennessee law, conversion "is the appropriation of tangible property to a party's own use in exclusion or defiance of the owner's rights."[11]  To make out a prima facie case of conversion, a party must prove: "(1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights."[12]  In order to constitute conversion, the defendant must intend to convert plaintiff's property.[13]

Underwood testified that the Defendants rented the enclosure beds with his full consent. He also testified that after a bit of back and forth with the Defendants, he was able to retrieve all of the beds.  Consequently, Plaintiffs are unable to make out a prima facie case of conversion. Therefore, the Court finds that Defendants did not convert the enclosure beds owned by Plaintiffs.

## IV.    Violations of the Tennessee Consumer Protection Act

---

[11]   *State ex rel. Paula Flowers v. Tennessee Coordinated Care Network, et al.,* No. M2003-01658-COA-R3-CV, 2005 WL 427990, at *7 (Tenn. Ct. App. Feb. 23, 2005).

[12]   *Id.*

[13]   *Thompson v. Thompson,* No. W2008-00489-COA-R3-CV, 2009 WL 637289, at *14 (Tenn. Ct. App. March 12, 2009).

Plaintiffs assert that Defendants representation in the APA that a finder's fee was not paid and the claims Defendant made to First Tennessee violated the TCPA as unfair and deceptive. The TCPA creates a cause of action for "[a]ny person who suffers an ascertainable loss of money or property . . . as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by" the TCPA.[14]  Specifically, Plaintiffs allege violations of Tennessee Code Annotated ("TCA") section 47-18-104(b)(27) and seek treble damages for these violations. These provisions read as follows:

> (b) . . . the following unfair or deceptive acts or practices affecting the conduct of any trade or commerce are declared to be unlawful and in violation of this part:
>
>> (27) Engaging in any other act or practice which is deceptive to the consumer or to any other person[.]

According to the Tennessee Supreme Court, the TCPA does not impose a single standard applicable to all cases for determining whether a particular act or practice is deceptive for the purpose of TCA section 47-18-104(b)(27).[15]  The Tennessee Supreme Court, however, has defined both "deceptive" and "unfair":

> A deceptive act or practice is a material representation, practice or omission likely to mislead a reasonable consumer. An act is unfair if it causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.[16]

Moreover, "[t]o be considered deceptive, an act is not necessarily required to be knowing or

---

[14]  Tenn. Code Ann. § 47-18-109(a)(1).

[15]  *Fayne v. Vincent*, 301 S.W.3d 162, 177 (Tenn. 2009).

[16]  *Davis v. McGuigan*, 325 S.W.3d 149, 162 (Tenn. 2010) (citations omitted).

intentional.  Negligent misrepresentation may be found to be a violation of" the TCPA.[17]

For the reasons this Court set forth above for finding Defendants liable for both the breach of contract claims and the intentional misrepresentation claim, this Court finds that Defendants have violated TCA section 47-18-104(b)(27).

## DAMAGES

## I.   Breach of Contract

With respect to awarding damages for a breach of contract, Tennessee courts have explained that:

> The purpose of assessing damages in the event of a breach of contract is to place the injured party in the same position it would have been in had the contract been fully performed.  The mere fact a party breaches a contract does not entitle the other party to an award of damages.  The injured party must sustain damages that consequently result from the breach.  Moreover, the injured party is not entitled to profit from the breach or be placed in a better position than had the contract been fully performed.[18]

In this case, Plaintiffs seek damages for both breaches of contract.  First, Plaintiffs seek damages in the amount of $900,000 (the difference between $3 million and the sales price of Naylor in the amount of $2.1 million) for the breach of Sections 5.2.4 and 5.2.6 of the APA. Second, Plaintiffs seek the entire balance of the Escrow Fund, $380,000.  In addition, Plaintiffs submit that they are entitled to pre-judgment interest at the statutory rate of ten percent (10%) per annum on entire balance of the Escrow Fund from April 1, 2009 to the date of this judgment and to post judgment interest on the escrow funds at the statutory rate of ten percent (10%) per

---

[17]   *Fayne*, 301 S.W.3d at 177.

[18] *Metro. Gov't of Nashville & Davidson Cnty. v. Cigna*, 195 S.W.3d 28, 35 (Tenn. Ct. App. 2005) (citations omitted).

annum from the date of this judgment until the funds are paid to Plaintiffs.  And, lastly, Plaintiffs assert that, pursuant to Section 8.2 of the APA, they are entitled to their reasonable attorneys' fees incurred in this action.

Defendants, on the other hand, state that Plaintiffs have suffered no damages because they received a more than fair price for Naylor's assets.  Additionally, Defendants state that Plaintiffs have suffered no damages from any  breach of the APA because Plaintiffs are entitled to the amount held in escrow.  Moreover,  Defendants argue that Plaintiffs are not entitled to attorneys' fees under the APA or the Escrow Agreement because, based on the plain meaning of the language and common sense understanding of those documents, the parties did not agree to pay each other's fees in the event of a dispute between them.

The Court finds that Plaintiffs have suffered damages pursuant to the breach of Sections 5.2.4 and 5.2.6 of the APA.  Underwood testified that had he known McDaniel was receiving a finder's fee, he would not have sold his business for $2.1 million; instead, he would have changed the purchase price to something higher than $3 million.  Additionally, Underwood testified that had Defendants refused to pay $3 million for Naylor, Underwood would have continued to operate Naylor at a profit of approximately $550,000 per year.  Moreover, the evidence presented showed that the valuation of Naylor did fluctuate.  The Court finds this testimony to be persuasive.

The Court finds Defendants liable for ten percent (10%) of the contract price, $210,000.  Although Plaintiffs seek an award of $900,000, the Court finds that a number of factors would operate to make such an award unreasonable.  These factors include that: Underwood knew McDaniel was consulting for Defendants, Underwood knew McDaniel's compensation was the

bonus or fee based on his growth of Defendants' rental revenue, Underwood expected McDaniel to be paid a bonus based on growing the revenue of Naylor in the event that Defendants purchased Naylor, and Underwood made the final accepted offer at $2.1185 million. Consequently, the Court finds $210,000 to be the reasonable amount of damages incurred by Plaintiff for this breach of contract.

For the breach of the duty of good faith and fair dealing and Section 7.6 of the APA, the Court finds Plaintiffs are entitled to the entire amount being held in Escrow.  Defendants claim that Plaintiffs owe $62,556.83 for the unpaid accounts receivable.  Defendants arrive at this number by offsetting the amount of uncollected accounts receivable, $85,048.83, by the excess net worth, $22,492.00.  Plaintiffs, however, state that the $85,048.83 amount should be offset by $37,492.24, which is the number Plaintiffs provide as the excess net worth.  The exact amount of excess is important.  If Plaintiffs' number is correct, the Plaintiffs do not owe Defendants any money on these unpaid accounts receivable as the claim would not exceed the $50,000.00 deductible set forth in Section 8.4(b) of the APA.

The Court notes that determining the amount of excess is a close call, but, because Plaintiffs were never able to obtain a readable copy of the unpaid accounts receivable, the Court finds in Plaintiffs' favor.   Consequently, Plaintiffs are entitled to the entire amount being held in Escrow.

 In addition to the damages sought for the breach of contract claims, as mentioned above, Plaintiffs seek pre-judgment interest on the damage award for the breach of the duty of good faith and fair dealing and Section 7.6 of the APA.  Tennessee law provides that prejudgment interest "may be awarded . . . in accordance with the principles of equity at any rate not in excess

of a maximum effective rate of ten percent (10%) per annum."[19]  Pre-judgment interest is intended to compensate parties that have been damaged "because they have been deprived of the use of that money from the time they should have received it until the date of judgment"–not to punish the wrongdoer.[20]  Moreover, the decision of whether to award pre-judgment interest is left to the "sound discretion" of the trial court.[21]  Here, both the amount of the obligation and the specific date of the obligation were certain under the escrow agreement.  Additionally, but for this breach, Plaintiffs would have had the use of this money for over two years.  Consequently, the Court grants the Plaintiffs request for pre-judgment interest at ten percent (10%) per annum.  The pre-judgment interest is awardable from the final disbursement date under the Escrow Agreement, March 31, 2009, to the date of this judgment.  The amount of pre-judgment interest is inclusive of the $5,000 of interest already accrued on the Escrow Funds.

Plaintiffs also seek attorneys' fees on both breach of contract actions.  Under Tennessee law, "litigants must pay their own attorneys' fees unless there is a statute or contractual provision providing otherwise."[22]  In this case, Section 8.2 of the APA provided:

> Indemnification of Buyer.  Buyer shall indemnify Seller and Shareholder. . . against and hold . . . harmless from (a) any and all loss, damage, liability or deficiency resulting from or arising out of any inaccuracy in or breach of any representation, warranty, covenant or obligation made or incurred by Buyer herein or in any other agreement, instrument or document delivered by or on behalf of Buyer in connection herewith . . . and (c) any and all costs and expenses (including reasonable legal and accounting fees) related to any of the foregoing.

---

[19]  Tenn. Code Ann. § 47-14-123.

[20]  *Scholz v. S.B. Intern., Inc.,* 40 S.W.3d 78, 82 (Tenn. Ct. App. 2000).

[21]  *Myint v. Allstate Ins. Co.,* 970 S.W.2d 920, 927 (Tenn. 1998).

[22]  *Taylor v. Fezell,* 158 S.W.3d 352, 359 (Tenn. 2005).

As Defendants consented to these terms and conditions through their course of dealing,

Plaintiffs' request for attorneys' fees is granted.  Plaintiffs shall submit within fifteen (15) days

of the date of this order a motion for attorneys' fees supported by proper documentation.

Defendants shall then have fifteen (15) days following the filing of Plaintiffs' motion to respond.

The Court will then determine the amount of fees to be awarded.

## II.  Intentional Misrepresentation and Fraud

Plaintiffs seek damages in the amount of $900,000 (the difference between $3 million

and the sales price of $2.1 million) for Defendants' intentional misrepresentation of the finder's

fee.  Plaintiffs are also seeking punitive damages under this claim.

For the intentional misrepresentation of the finder's fee, the Court finds the Defendants

liable for ten percent (10%) of the contract price, $210,000.  The Court finds this amount

appropriate for the intentional misrepresentation claim for the same reasons mentioned for the

breach of Sections 5.2.4 and 5.2.6 of the APA.

As mentioned above, Plaintiffs also seek punitive damages on this claim.  Punitive

damages are intended to "punish a defendant, to deter him from committing acts of a similar

nature, and to make a public example of him."[23]  "Punitive damages are thus appropriate only in

the most egregious cases and, consequently, a verdict imposing such damages must be supported

by clear and convincing evidence that the defendant acted intentionally, fraudulently,

maliciously, or recklessly."[24]  A person acts recklessly "when the person is aware of, but

---

[23]  *Goff v. Elmo Greer & Sons Const. Co.,* 297 S.W.3d 175, 187 (Tenn. 2009) (quoting *Huckeby v. Spangler,* 563 S.W.2d 555, 558-59 (Tenn. 1978)).

[24]  *Goff,* 297 S.W.3d at 187 (citing *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 901 (Tenn. 1992)).

consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all of the circumstances."[25]  Here, the Court finds that Defendants acted recklessly. Defendants were aware of the finder's fee provision in the APA, Defendants referred to the $30,000 as a finder's fee internally, Defendants internally discussed potentially disclosing this finder's fee to Underwood, and Defendants consciously disregarded the need to disclose this finder's fee to Underwood despite signing a contract explicitly stating otherwise.  This is a gross deviation of the standard of care.  An ordinary person would recognized the need to disclose or, better yet, not pay a finder's fee when the payment would explicitly be in violation of the signed contract.  Therefore, the Court finds the Plaintiffs are entitled to an award of punitive damages in the amount of $315,000.

### III.  Conversion Claims

Although the Court found that Defendants were not liable for Plaintiffs conversion claim, the Court does find that Plaintiffs are entitled to fifty percent (50%) of the $14,000 in revenue Defendants received.  The Court also awards the Plaintiffs $3,000 for damage to the beds. Therefore, the Court finds Plaintiffs are entitled to $10,000 for Defendants' use of the enclosure beds.  The Court does not find that pre-judgment interest on this award is proper.

### IV.  Violations of the Tennessee Consumer Protection Act

Upon finding that a party violated the TCPA, the court may award damages as well as reasonable attorneys' fees.[26]  Here, for the reasons stated above for both breach of contract

---

[25] *Hodges,* 833 S.W.2d at 901.

[26] Tenn. Code Ann. § 47-18-109(e)(1).

actions, the Court finds that Plaintiffs are entitled to an award of $210,000 for the breach of Sections 5.2.4 and 5.2.6 of the APA, an award of $380,000 plus pre-judgment interest for the breach of the Escrow Agreement and Section 7.6 of the APA, and attorneys' fees.

The TCPA goes on to state that, "i[f] the court finds that the use or employment of the unfair or deceptive act or practice was a willful or knowing violation of this part, the court may award three (3) times the actual damages sustained and may provide such other relief as it considers necessary and proper."[27]  The Court does not find that the evidence supports an award of treble damages as the Plaintiffs have not shown that the violations of this part were willful or knowing.

## CONCLUSION

Based on the foregoing, the Court enters judgment for the Plaintiffs on the breach of contract claims, the intentional misrepresentation claim, and the TCPA claim.  The Court finds Plaintiffs are entitled to: $210,000 for the breach of Sections 5.2.4 and 5.2.6 of the APA; $380,000 of the Escrow Funds plus pre-judgment interest (inclusive of the $5,000 in interest already accrued); $315,000 in punitive damages under the intentional misrepresentation claim; and $10,000 for the enclosure beds. Duplicative awards are not available.  Post judgment interest is mandatory, and will be calculated at a rate pursuant to 28 U.S.C. § 1961.  The Court will award attorneys' fees by separate order.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: June 3, 2011.

_____

[27]  Tenn. Code Ann. § 47-18-109(a)(3).

29